[No. 33291.   Department One.   November 10, 1955.]

BETTY JEAN THOMPSON, *a Minor, by Robert B. Thompson, her Guardian ad Litem, Respondent,* v. HARRIS WOLD, *Appellant.*[1]

[1]Reported in 289 P. (2d) 712.

*H. Earl Davis,* for appellant.

*Cashatt & Williams,* for respondent.

DONWORTH, J.—This appeal involves the common-law liability of the owner and keeper of a dog for injuries sustained by a guest when bitten by the dog in the home of its owner.

Harris Wold, who resides near Missoula, Montana, purchased an American bull terrier dog from Houston Lemon in the latter part of December, 1952. The dog, named Captain Fritz, was then six or seven weeks old. Wold testified that he purchased the dog (a) because he liked its looks, (b) wanted it for a watch dog, and (c) thought it would make a good pet for his children, ages fifteen and six.

Eleanor Thompson, mother of the injured guest, is Wold's half sister. She, her husband (the guardian *ad litem*), and their three children reside in Spokane.

The latter part of July, 1953, Robert Thompson, husband of Eleanor, made a social call on the Wold family at their home. He was accompanied on this visit by Raymond Fox, a business associate. At the time of this visit, Wold extended an invitation to the Thompson family to visit at his home in the near future.

On August 2, 1953, Mr. and Mrs. Thompson, their three small children, a young girl (referred to as a mother's helper), and Fox motored to Missoula and visited at the Wold home. After eating supper there, Robert Thompson and Fox went to a hotel while the remaining members of the party spent the night in the Wold home.

The next morning, Mrs. Thompson was the first of the household to arise. She commenced feeding her children in the kitchen. Captain Fritz, who had been locked in the basement the night before by Wold, was let out of the basement by Mrs. Thompson and allowed to run in the front yard. Shortly thereafter, Mrs. Thompson heard what sounded like a dog fight outside the house. She opened the front door, called Captain Fritz back into the house, and, using a paper towel, wiped some blood from the dog's nose.

The Wold family then arose, and the entire household congregated in the living room, where Wold, for about thirty minutes, played with Captain Fritz. This play consisted mostly of a tug of war between Wold and the dog with a short piece of rope, one end of which Wold held, and the other end was held by the dog in its mouth. The dog seemed to be playful as it growled and tugged at the rope.

After a period of this play, Wold, his wife, and Mrs. Thompson proceeded to the kitchen to prepare breakfast. Betty Jean Thompson, then twenty-three months old, was left alone with the dog in the living room. A few seconds after the adults had turned their backs on Betty Jean and the dog, they heard the dog growl, or grunt, and the child scream. Turning around, they saw Betty Jean lying on the floor, crying. She had been bitten in the face by the dog. Her nose, cheeks, upper lip, and upper jaw had been severely mutilated.

In July, 1954, Betty Jean Thompson, by her guardian *ad litem,* commenced this action, seeking to recover damages for the injuries she sustained. The complaint alleged, basically, that defendant Wold knew that Captain Fritz was of a vicious nature, and was likely to attack or injure persons; that defendant was negligent in permitting the dog to be unattended in the same room with a small child, and in failing to warn the parents of the potential danger the dog might be to the child. The answer denied the allegation of negligence, and denied any knowledge on the part of defendant that the dog was of a vicious nature and likely to attack or injure persons.

When the case came on for trial, defendant moved to amend his answer by pleading that the tort occurred in the state of Montana, outside the corporate limits of any town, and that "the laws of the state of Montana apply to this cause." No decisions or statutes from that state were pleaded. Defendant orally informed the trial judge that the matter in issue was, in that state, governed by common-law rules. Plaintiff acquiesced, and the case, both at trial and on appeal, has been presented in conformance with such rules. We shall assume, then, for purposes of this appeal, that the laws of Montana were properly pleaded, and that the common-law rules of liability are controlling.

At the close of plaintiff's case, defendant challenged the sufficiency of the evidence and moved for a nonsuit on the ground that plaintiff had failed to prove a cause of action. The motion was denied. At the close of all the testimony, defendant renewed the challenge to the sufficiency of the evidence and the motion for dismissal on the same grounds as previously urged, and further moved the court to direct the jury to return a verdict in favor of defendant. These motions were denied.

The court then instructed the jury. After the jury retired, defendant excepted to four instructions given and to the court's refusal to give six of defendant's requested instructions. The jury returned a substantial verdict for plaintiff. Thereafter, defendant's alternative motions for judgment n.o.v. or for a new trial were timely made and denied, and judgment was entered on the verdict.

Defendant has appealed from the judgment entered, and limits his appeal solely to the question of liability. Therefore, we need not discuss the extensive injuries suffered by Betty Jean, nor the medical and dental care she received prior to trial and will require in the future.

Appellant makes fourteen assignments of error. Assignment No. 1 complains of the court's action in sustaining an objection to certain testimony of Houston Lemon offered by defendant. Assignments Nos. 2, 13, and 14 complain of the denial of the motions above mentioned, and of the entry of judgment. Assignments Nos. 3, 4, 5, and 6 assign error

to instructions given by the court. Assignments Nos. 7, 8, 9, 10, 11, and 12 complain of the trial court's refusal to give certain of defendant's requested instructions.

In order to rebut respondent's evidence supporting her allegation that Captain Fritz was a vicious dog, appellant called as a witness Houston Lemon. He testified that he sold Captain Fritz to respondent, that he still had the mother and some of the other dogs of the same litter, and that the mother was not vicious but was a friendly dog.

When appellant attempted to elicit from Lemon testimony regarding the general characteristics and temperament of the other dogs of the same litter, respondent objected, stating, in effect, that, while expert testimony as to the general characteristics of the particular breed of dog (American bull terrier) was properly admissible, testimony with regard to the temperament and characteristics of any specific dog other than Captain Fritz, was not competent evidence in the case. The trial court expressed a similar view, and sustained the objection. Appellant then attempted to examine the witness on his general knowledge of the particular breed. When it became evident that the witness had no general knowledge of the breed other than what he had acquired by virtue of his ownership of the dogs of Captain Fritz' litter and their mother, this line of questioning was abandoned.

Later, Anthony J. Lyons, a kennel owner and professional dog handler and trainer, was called as an expert witness by appellant. Under direct and cross-examination, this witness testified at length to the general temperament and characteristics of this breed of dogs. His knowledge was gained through his long experience with dogs, and by reading and studying textbooks written by authorities on the subject.

Regarding assignment No. 1, appellant complains of the court's action in sustaining the objection to Mr. Lemon's testimony above mentioned, and argues that, by that ruling, the court denied appellant an opportunity to show the characteristics of this particular type or breed of dogs.

Appellant, in his brief, calls our attention to what he calls a matter of common knowledge, to which Lyons testified, to wit, that dogs, as domesticated animals, are by nature

friendly to man and ordinarily not vicious *unless trained to be vicious.*

Captain Fritz was separated from the litter when less than two months old. There was no evidence showing that Captain Fritz and the rest of the litter received identical training. Therefore, since it could not be connected up, proof of the lack of viciousness in the mother or in the rest of the litter would not be competent evidence to prove a similar trait in the temperament of Captain Fritz.

Appellant did not make an offer of proof when the objection was sustained, and the witness then on the stand indicated that his very limited knowledge of the breed was based solely upon his observation of the animals he owned. The trial court's ruling did not prevent appellant from showing, by proper evidence, the temperament and characteristics of the breed of dogs. Great latitude was allowed in the questioning of Mr. Lyons, appellant's expert witness. In our opinion, the trial court did not err in sustaining the objection to Mr. Lemon's testimony.

Former Chief Justice Ray of the supreme court of Indiana, in his work, Negligence of Imposed Duties (1891), states, at p. 616, "the gist of the action for injury from an animal known to be inclined to be vicious is the wrong in keeping the animal after such knowledge."

Prosser on Torts (1941) 432, § 57, states:

"The keeper of an animal of a species dangerous by nature, or of any animal which he knows, or has reason to know, to have dangerous propensities, is liable, without wrongful intent or negligence, for damage to others resulting from such a propensity."

and, at page 440 of Prosser's work, it is said:

"While the owner may not be liable for a mere failure to discover the traits of his dog, it is sufficient that he has notice of facts which would put a reasonable man on his guard, and he is charged with knowledge of the characteristics that are reasonably apparent to him. Notice that the dog has once bitten a man is sufficient to establish scienter that he may do it again, but the often repeated statement that 'every dog is entitled to one bite' is not the law. It is enough that the dog has manifested a vicious disposition,

and a desire to attack or annoy people or other animals. Such knowledge may be inferred from the fact that the dog is kept confined, or even from continued ownership of an animal whose tendencies are obvious, or from its reputation in the neighborhood. Under familiar agency principles, the owner is charged with the knowledge of a servant, or a member of his family, to whom he has entrusted its custody. In some jurisdictions, statutes have been enacted imposing absolute liability for certain types of damage done by animals. And scienter is of course not required where any negligence can be shown in the keeping or control of the animal."

Our search reveals but one statute in the state of Montana varying the common law on this subject. That statute (RCM 17-409) does not apply to this case, for it is limited in its scope to events transpiring within corporate limits.

As an adverse witness, Wold admitted that there was no question in his mind but that the dog had bitten Betty Jean.

Fox testified that, on his first visit to the Wold home approximately one week before Betty Jean was injured, he and Mr. Thompson went to the garage to see Wold. At that time, Captain Fritz was chained to the clothesline in the yard. Wold cautioned Fox to be careful of the dog, and said: "I don't think he will bother you. He won't bother you while I am here." Fox also testified that Wold explained the reason the dog was chained to the clothesline was so that it would not jump up and bother people coming into the yard.

Fox further testified that, after dinner on the evening of August 2nd, he was sitting on the davenport in the living room and saw Betty Jean make three attempts to pet the dog. Each time, however, the dog growled and moved away from her. Wold then took the dog and put it in the basement. Fox thought the dog growled in a "menacing manner," but he did not tell either Mr. or Mrs. Thompson of what he had observed.

Eleanor Thompson, mother of Betty Jean, testified that, prior to August 2nd, the only time she had seen the dog was in February, when it was a tiny puppy. She had never

observed anything about the dog which would cause her to think that it might bite anyone. She testified that Fox did not communicate to her that the dog had growled at Betty Jean, and that Wold had said nothing to her as to whether or not it would be safe to leave the dog unattended in the same room with Betty Jean.

Wold testified on cross-examination that he had noticed nothing vicious about the dog before it had bitten Betty Jean, except that it would growl if, when it was eating, someone attempted to take the food away, particularly if it was then eating meat. He admitted that his wife expressed an opinion to Mr. Thompson, on the evening of August 2nd, that with the presence of so many strangers and children in the house, and the attendant excitement and confusion, she thought there was a possibility that the dog might bite some of the children. Wold knew that the dog, as he said, always bothered people and jumped up on them.

On his pretrial deposition (portions of which were admitted by Wold, while on the stand, to be correct), in response to the question: "You tied him in the basement the evening before because you felt he might injure one of the children? Is that right?", Wold answered, "That is right." In response to this question: "But you did, in your own judgment, in a general way feel that the dog was somewhat vicious?", Wold replied, "He wasn't vicious, but if people picked on him, he was." And, again:

"Q. You knew that if somebody started abusing him, he might snap at them or bite them? A. That is right. Q. And you had seen enough of the dog's personality before that to realize that? A. Yes. . . . [He testified the dog was not used to the company of small children.] Q. And that is one of the reasons you put him in the basement? Isn't that right? A. That is right. Q. Because you thought he might possibly bite somebody? A. I didn't know. Q. But you felt there was danger of it, didn't you? A. Yes."

██ The matters complained of in assignments Nos. 2, 13, and 14, can all be disposed of by answering the question, "Did plaintiff prove a cause of action?" With relation to the motions there involved, the evidence must be viewed

in the light most favorable to respondent and against the moving party. In our opinion, respondent's evidence was sufficient to carry the case to the jury.

Inasmuch as there was substantial evidence which, if believed by the jury, would support the verdict, the judgment entered thereon will not be disturbed, unless we find that there was error in the instructions given or in the court's refusal to give any of appellant's requested instructions.

Assignments Nos. 3 and 5 complain that the court, by instructions Nos. 2 and 4, "withdrew from the consideration of the jury the entire issue of imputed negligence or provocation on the part of the plaintiff." Appellant cites *Hilstad v. Seattle*, 149 Wash. 483, 271 Pac. 264, as holding that in an action for *wrongful death* of a child brought by the parent of the child, the parent's negligence will bar recovery, and *Conway v. Monidah Trust*, 52 Mont. 244, 157 Pac. 178, as authority for the rule that, in an action brought by a parent to recover special damages incurred through a minor's injury, the negligence of the parent which contributed to the injury will bar recovery. The *Hilstad* case is not in point, because this is not an action for wrongful death. Nor is the cited *Conway* case in point. In an earlier case, *Conway v. Monidah Trust*, 47 Mont. 269, 132 Pac. 26, 51 Mont. 113, 149 Pac. 711, which was brought by the child to recover damages for the injuries he sustained, the Montana court allowed the child to recover his damages.

■ ■ It follows, therefore, that the issue of Eleanor Thompson's negligence, if any existed, was not properly a matter for the jury's consideration in this action brought by the child. The record is devoid of any evidence on the subject of provocation. If provocation had been considered by the jury, it would have been based solely upon conjecture and speculation. In our opinion, the court did not err in giving instructions No. 2 and No. 4.

■ In assignment No. 4, appellant contends that instruction No. 3 is erroneous in that it fails to specify the conduct of the dog upon which the jury could find it was a vicious and dangerous animal, and that it fails to require the jury

to find knowledge on the part of appellant of this viciousness before a verdict in favor of the injured child could be returned. In this instruction, the court informed the jury that, in order to establish that the dog had a vicious nature, it was not necessary to show that it had bitten some person prior to the injury of Betty Jean. The instruction further said:

"The owner of a dog is liable for injuries inflicted upon a child by his dog if the previous conduct of the dog of which the owner had knowledge was such that an ordinarily prudent person would anticipate that the dog might injure children, even though the dog had not previously bitten or injured anyone."

This instruction is substantially in the language of *Robinson v. Marino*, 3 Wash. 434, 28 Pac. 752, and, in our opinion, is a correct expression of the rule at common law. Elsewhere in the instructions, the court defined "vicious propensities" and impressed upon the jury the fact that knowledge of this trait of the dog by the owner was a prerequisite to his liability for the injuries suffered by Betty Jean.

■ Instruction No. 12 (assignment No. 6) instructed the jury that the fact that the lawsuit was between relatives should not affect their verdict in any respect. Appellant contends that this instruction informed the jury that someone other than appellant was to be responsible for the judgment imposed. Appellant cross-examined Mrs. Thompson as follows:

"Q. You don't feel as friendly to Mr. and Mrs. Wold now as you did, do you? A. I feel terribly confused and hurt. Q. You didn't really blame Mr. Wold for this occurrence, did you? A. Blame him? Q. Yes. A. I don't know exactly what I thought about it. Q. You don't blame him for it at all? A. I blame the dog. Q. You blame the dog?"

In our opinion, the instruction complained of was properly given, and, in view of the testimony quoted above, was not given for the purpose and did not have the effect suggested by appellant.

The remaining assignments of error, all concerned with appellant's proposed instructions which were refused by

the trial court, may be divided into two categories. First, assignments Nos. 7, 8, 9, and 10 refer to the common-law liability of the owner of a dog. Second, assignments Nos. 11 and 12 relate to the rules governing host-guest liability.

With regard to the first category, appellant argues that the evidence totally failed to prove any knowledge on the part of appellant of the vicious propensities of the dog, and that, because of this failure, it was error to refuse to give the requested instructions. The question for the jury was not precisely whether appellant had such knowledge, but whether, as above quoted from Prosser on Torts, "he has notice of facts which would put a reasonable man on his guard, and he is charged with knowledge of the character-istics that are reasonably apparent to him." There was suf-ficient evidence to take the case to the jury on this issue, and the court therefore did not err in refusing the proposed instructions.

As to the second category, appellant argues that, according to Montana law, Betty Jean, at the time of her injury, was a licensee and not an invitee. This argument does not merit further discussion, because at common law the owner of a vicious dog has been held liable even to a trespasser. *Brewer v. Furtwangler,* 171 Wash. 617, 18 P. (2d) 837, and the discussion of the cases and text matter cited therein.

Upon a review of the entire record, we are of the opinion that appellant had a fair trial, and that the verdict and judgment thereon are based upon substantial evidence. Finding no error in the record, the judgment is affirmed.

HAMLEY, C. J., SCHWELLENBACH, FINLEY, and OTT, JJ. concur.